UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

---

In Re:

| | |
|---|---|
| JOHN BARKSDALE AND<br>LORETTA BARKSDALE,<br><br>      Debtor. | Chapter 7<br>Case No.: 08-63096 |

---

In Re:

| | |
|---|---|
| BUTCHSON BARKSDALE,<br><br>      Debtor. | Chapter 7<br>Case No.: 09-63082 |

---

In Re:

| | |
|---|---|
| WHITE'S LUMBER, INC.,<br><br>      Plaintiff,<br><br>vs.<br><br>BUTCHSON BARKSDALE,<br><br>      Defendant. | Adv. Pro. No.: 09-80027 |

---

In Re:

| | |
|---|---|
| WHITE'S LUMBER, INC.,<br><br>      Plaintiff,<br><br>vs.<br><br>JOHN BARKSDALE,<br><br>      Defendant. | Adv. Pro. No.: 09-80028 |

---

APPEARANCES:

| | |
|---|---|
| STYLE & BURROWS<br>*Attorneys for Plaintiff*<br>104 Washington Street<br>Watertown, New York 13601 | CHRISTINA E. STONE, ESQ. |

JERRY C. LEEK, ESQ.
*Attorney for Debtors-Defendants*
107 South Canton Road
Potsdam, New York 13676

Honorable Diane Davis, United States Bankruptcy Judge

**MEMORANDUM-DECISION AND ORDER**

Plaintiff White's Lumber, Inc. ("Plaintiff") commenced the above-referenced adversary proceedings by filing separate Complaints against Debtors-Defendants Butchson Barksdale ("Butchson") and his father, John Barksdale ("John") (collectively, "Debtors" or "Defendants"), on April 9, 2009, seeking, inter alia, a determination that the judgment debts owed to Plaintiff by Debtors individually are nondischargeable under 11 U.S.C. § 523(a)(4) by reason of defalcation.[1] (Adv. Pro. No. 09-80027 ("Adv. Pro. 1"), ECF No. 1; Adv. Pro. No. 09-80028 ("Adv. Pro. 2"), ECF No. 1). Debtors filed a joint Answer and Counterclaim on May 5, 2009 ("Joint Answer"), asserting several affirmative defenses, including statute of limitations, collateral estoppel, and waiver, as well as a counterclaim for attorneys' fees. (Adv. Pro. 1, ECF No. 4; Adv. Pro. 2, ECF No. 6). By Order issued October 15, 2009, the Court granted Plaintiff's motion to consolidate the adversary proceedings. (Adv. Pro. 1, ECF No. 15; Adv. Pro. 2, ECF No. 12.) Pursuant to the Court's Scheduling Order issued on October 19, 2009, the consolidated matter came to trial on May 5, 2010. (Adv. Pro. No. 1, ECF No. 18; Adv. Pro. 2, ECF No. 13.) Following the parties' submission of post-trial memoranda of law, first by Plaintiff on June 16, 2008 ("Plaintiff's Post-Trial Memorandum") (Adv. Pro. 1, ECF No. 26; Adv. Pro. 2, ECF No. 20), then by Debtors on June 21, 2008 ("Defendants' Post-Trial Memorandum") (Adv. Pro. 1, ECF No. 27; Adv. Pro. 2, ECF No. 21), the Court took the matter under advisement. The following now constitute the

---

[1] Unless otherwise indicated, all statutory references herein are to the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (2006).

Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## JURISDICTION

The Court has jurisdiction over the parties and subject matter of this core adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1) and (b)(2)(I).

## FACTS

Between the parties' Joint Stipulation of Facts filed on May 13, 2010 ("Joint Stipulation") (Adv. Pro. 1, ECF No. 22; Adv. Pro. 2, ECF No. 18), and the testimonial evidence elicited at trial, the Court finds the facts below to be uncontroverted.

The following facts are taken directly from the Joint Stipulation:

1. The [Debtors] were involved in the contracting business doing work under the name of Barksdale Construction and/or Barksdale's You Name It.

2. The [Debtors] performed several contracting jobs in and around St. Lawrence County, State of New York.

3. [Plaintiff] is a lumber/building supply company which sold to [Debtors] on credit building supplies and materials incorporated into several home projects including one owned by Walter and Dorothy Simmons [the "Simmons Project"] and for spec houses owned in part by Butchson Barksdale [the "Spec Homes Project"].

4. As a result of the relationship, [Plaintiff] is a creditor of [Debtors].

5. John Barksdale opened up a credit account with [Plaintiff]. [*See* Charge Account Application, Pl.'s Ex. 3.] John Barksdale allowed his son, Butchson Barksdale, to use the credit account. Both [Debtors] remained responsible for payment of the account.

6. [Plaintiff] commenced an action in New York State Supreme Court, St. Lawrence County, against [Debtors] in the principal amount of One Hundred Two Thousand Three Hundred Fifty-Three Dollars and Eight Cents ($102,353.08) [the "State Court Action"]. [*See* Notice of Pendency, Summons, and Verified Compl., Defs.' Exs. B and C.] With interest the amount due was One Hundred Eighteen Thousand Nine Hundred Forty-Nine Dollars and Forty-Nine Cents ($118,949.49).

7. [Debtor] Butchson Barksdale paid Thirty-Five Thousand Dollars ($35,000.00) and signed a confession of judgment for the total amount of Eighty-Seven Thousand Six Hundred Seven Dollars and Forty-One Cents ($87,607.41) [the "Butchson Judgment"]. [Aff. Of Confession of J., Defs.' Ex. A.]

8. [Debtor] John Barksdale failed to answer the Summons and Complaint and a default judgment was entered against [Debtor] John Barksdale in the amount of Eighty-Seven Thousand Six Hundred Seven Dollars and Forty-One Cents ($87,607.41) [the "John Judgment"]. [Defs.' Ex. D.]

9. [Debtors] were paid in full by the homeowners, Walter and Dorothy Simmons, for the construction of the Simmons[es] home. The Simmons[es] paid [Debtors] One Hundred Fifty-Three Thousand Dollars ($153,000.00). [Plaintiff] was not paid for the building supplies and materials supplied to the home.

10. Walter and Dorothy Simmons paid over to Moses Barksdale ["Moses"], a relative of [Debtors], Fifteen Thousand Dollars ($15,000.00) on or about October 26, 2006[,] with the consent of [Plaintiff]. The money was intended to be used in connection with a loan application for one of the "spec" homes. If the loan was approved and the house sold to Moses Barksdale, then the bill to [Plaintiff] would have been paid in full.

(Joint Stipulation ¶¶ 1–10.) Certain of these stipulated facts require further clarification, which the Court draws from the exhibits entered into evidence and the trial testimony of Maurice Cleaver ("Cleaver"), Plaintiff's Credit/Personnel Manager, Bradford White ("White"), Plaintiff's President, and Debtors.

Debtors offered testimony regarding the circumstances relating to both the Simmons Project and the Spec Homes Project, which they worked on concurrently. John testified that he owns the real property where the spec homes are situated, which consists of approximately six acres that he subdivided from a larger fifty acre plot with the intention of giving his sons, Butchson and Moses, each a lot so that they could earn experience building their own homes and grow accustomed to the construction business. The land is located approximately fifty miles from Fort Drum, New York and the family's original plan was to use the two spec houses as

models for continuation of a development for Fort Drum soldiers to be built on the remainder of the fifty acre plot.

In his November 24, 2009 deposition taken in connection with the State Court Action, Butchson testified that the Spec Homes Project began a few years before the Simmons Project, but it was delayed due to the Barksdales' previous commitment to complete a townhouse project at Potsdam State University. (Butchson Dep. at 9–11, Nov. 24, 2009, Pl.'s Ex. 5.) Both Butchson and Moses invested their own funds in the Spec Homes Project. Butchson testified that he refinanced his primary residence and invested $30,000 into the Spec Homes Project for site work and infrastructure, including the drilling of wells, pouring of cement foundations, and installation of driveways. Work on the Spec Homes Project ceased in 2006, however, when the Barksdale family ran out of money to continue with construction. In their current state, the spec homes are framed "shells," each consisting of a roof, with some but not all of the windows installed, and partial siding. According to both Debtors, the spec houses are weathered and have suffered water damage due to flooding. Butchson was unable to complete either of the spec houses after he assumed responsibility as lead contractor for the family's construction business in 2006 once his father, John, suffered serious medical problems. In fact, he testified that his construction equipment was repossessed by the bank and his home was foreclosed shortly before he filed for bankruptcy relief.

John testified that the Simmonses contracted with him to build their home after Walter Simmons viewed the start of the spec homes in 2005. He further testified that the Simmons Project was completed in 2006, and in that year the State of New York issued a certificate of occupancy for the home. The Simmonses made periodic advances to John during construction of their home and he in turn deposited those advances into a business checking account. At various

times, he used the business account to pay personal expenses, including his mortgage, medical bills, and his wife's expenses. At some point, due to health issues, John allowed his son, Butchson, to "take control of the Simmons Project," and to purchase materials from Plaintiff on credit for the same. John also allowed his son to charge materials for the Spec Homes Project to the account with Plaintiff.

In the spring of 2006, however, after failing to receive payment in full from Debtors for materials supplied and used in both the Spec Homes Project and the Simmons Project, Plaintiff filed two mechanics' liens. The first mechanic's lien was filed with the Saint Lawrence County Clerk's Office on March 9, 2006, in the amount of $23,135.73, against the Barksdales' property where the spec homes were located and John and Butchson as the title owners (the "Barksdale Lien"). (Defs.' Ex. K.) The second mechanic's lien was filed with the Saint Lawrence County Clerk's Office on August 7, 2006, in the amount of $50,180.24, against the Simmonses real property and Walter and Dorothy Simmons personally as the title owners (the "Simmons Lien"). (Defs.' Ex. J; Pl.'s Ex. 6.) On October 25, 2006, Plaintiff executed and filed a discharge of the Simmons Lien. (*Id.*) On June 5, 2009, Plaintiff executed and filed a discharge of the Barksdale Lien. (Defs.' Ex. K.) Cleaver testified that Plaintiff discharged the Simmons Lien out of fairness to the Simmonses, once Plaintiff learned they had paid Debtors the full contract price of $153,000 for completion of their home. The documentary evidence, however, includes a check from the Simmonses dated October 26, 2006, payable to Moses and Plaintiff as and for the "final payment" on the Simmons Project in the amount of Fifteen Thousand Dollars ($15,000). (Defs.' Ex. F.) The check was endorsed by Moses and White. Butchson, Cleaver, and White all testified that Plaintiff allowed Butchson and/or Moses to use those funds to attempt to secure alternate financing for completion of the Spec Homes Project. As stipulated, the parties mutually

understood that Debtors would use the proceeds from the sale of one of the completed spec houses to pay their outstanding account balance owed Plaintiff in full.

In his November 29, 2009 deposition, Butchson stated that Moses intended to secure financing for the completion and purchase of one of the spec houses through a loan obtained from Countrywide Home Loans ("Countrywide"). (Butchson Dep. at 10–11, Nov. 24, 2009, Pl.'s Ex. 5.) Cleaver testified during trial that he was made aware of this plan to finance completion of the spec houses, but that approval of the loan was contingent upon the Barksdales' ability to prove some amount of value or minimum percentage of equity in the spec home. Debtors' records indicate that Moses applied for the loan, and the loan application was received by Countrywide on or about October 27, 2006. (*See* Oct. 27, 2006 Letter from Countrywide Home Loans to Plaintiff, Defs.' Ex. E.) On October 27, 2006, Butchson signed and remitted to Plaintiff a statement that, upon payment from Moses of One Hundred and Fifty-Six Thousand Dollars ($156,000) for the sale of one of the spec homes, he would pay John's then outstanding debt to Plaintiff in the amount of One Hundred Thousand Dollars ($100,000). (Pl.'s Ex. 3.) The loan application was ultimately denied, which forced Debtors to abandon the Spec Homes Project altogether.

Cleaver acknowledged that John's credit with Plaintiff was "initially very good." White confirmed that John had been a regular customer of Plaintiff since 1999, but he could not recall the exact date John's account became delinquent or when the account was closed. Cleaver testified that Plaintiff routinely applied the payments received from John or another member of the Barksdale family to the oldest account receivable, without reference to a particular job. Butchson testified that he "never tried to get out of paying Plaintiff," and that he sent money to Plaintiff whenever he could. For example, even after entry of the Butchson Judgment, Butchson

sold equipment and remitted the sale proceeds in the amount of Thirty-Five Thousand Dollars ($35,000) to Plaintiff to pay down the judgment debt in full. (*See* Treasurer's Check No. 50996 Issued by North Country Savings Bank on April 3, 2008, and Acknowledged by Plaintiff's Counsel, Defs.' Ex. I.) At some point, however, Butchson was unable to make any further payments to Plaintiff and filed for bankruptcy.

## ARGUMENTS

Plaintiff's arguments are straightforward. Plaintiff contends that defalcation is broadly defined to include any failure, innocent or otherwise, by a fiduciary to account for or pay over trust fund monies. (Pl.'s Post-Trial Mem. at 1.) Plaintiff asserts that under Article 3-A of the New York Lien Law ("Article 3-A"), N.Y. LIEN LAW §§ 70–79-a (Consol. 2010), a statutory trust was created when the Simmonses paid Debtors for the construction of their home, and Debtors became obligated to Plaintiff as one of the trust's beneficiaries to use the monies paid by the Simmonses for payment of trust claims for labor performed and/or materials furnished in connection with the Simmons Project. Notwithstanding that the credit account was opened by John and maintained in John's name alone, Plaintiff suggests that both John and Butchson should be deemed responsible for the debt in the entire amount of $87,607.41 due to the consent and acknowledgment of both Debtors that Butchson was allowed to charge purchases to John's account and Butchson agreed to assume liability for the resulting indebtedness. (Pl.'s Post-Trial Mem. at 6–7.) Plaintiff further contends that John and Butchson were obligated as statutory trustees under Article 3-A to maintain detailed books and records documenting the receipts and expenses of the trust assets. Plaintiff argues that their failure to do so gives rise to a presumption of diversion under state law. (*Id.* at 3–6.) In sum, Plaintiff concludes that Debtors failure to

account and the diversion of trust assets rises to the level of defalcation for purposes of nondischargeability of Plaintiff's debt in Debtors' respective bankruptcy cases.

In addition to Debtors' arguments in support of their affirmative defenses, which will be separately discussed and addressed in greater detail herein, Debtors advance several reasons for why Plaintiff has failed to meet its burden under § 523(a)(4).  Debtors argue that under state law, a fiduciary relationship arose only between John and Plaintiff and it extended only to those transactions related to the Simmons Project.  (Defs.' Post-Trial Mem. at 11–12.)  Debtors state that no fiduciary relationship between the parties arose as a result of the Spec Homes Project because Article 3-A statutory trust fund provisions do not apply when the contractor is also the homeowner or real property owner and the contractor utilizes his own monies to fund the cost of improvement to the real property.  Further, Debtors argue that a fiduciary relationship never arose between Butchson and Plaintiff because Butchson never received any funds from either the Spec Homes Project or the Simmons Project.  It is Debtors' contention that, at all times, they intended to pay Plaintiff in full and Butchson planned to continue in the construction business to accomplish this end.  Debtors assert that their actions prove as much (*id.* at 13), but that mounting financial difficulties, including Moses' inability to obtain a loan from Countrywide, made it impossible for them to do so (*id.* at 10).

## DISCUSSION

### I.     Debtors' Statute of Limitations, Collateral Estoppel, and Waiver Defenses

Debtors have raised statute of limitations, collateral estoppel, and waiver as defenses to all causes of action asserted by Plaintiff.  For numerous reasons, Debtors' arguments are unavailing.

Debtors contend that because Plaintiff proceeded against them in the State Court Action on a theory of contract or account stated, rather than fraud or breach of fiduciary duty, Plaintiff is now barred from seeking a determination as to the dischargeability of the judgment debts entered in connection with the State Court Action.[2] New York law is determinative of the issue whether collateral estoppel applies. *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 65 (2d Cir. 2007), *cert. denied*, 129 S. Ct. (Jan. 12, 2009). "Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Id.* at 66 (citing cases).

It is clear that breach of contract or account stated causes of action do not involve elements or issues identical to those adjudicated in the context of a § 523(a)(4) action. Plainly stated, neither of these state law causes of action require the existence of a fiduciary relationship or consideration of the mental culpability of the defendant. Further, even if Plaintiff had proceeded in the State Court Action under Article 3-A, collateral estoppel would not apply to preclude Plaintiff from trying to prove nondischargeability of the judgment debts it now holds. While defalcation under bankruptcy law and misappropriation under state law share a common element, namely the existence of a fiduciary relationship between the parties, the standard for defalcation under § 523(a)(4) is narrower than that for misappropriation under Article 3-A. Questions of whether a debt was owed under a revolving line of credit or whether a breach of fiduciary duty occurred do not require proof of a culpable mental state under New York law, but

---

[2] The Court notes that Debtors failed to affirmatively assert collateral estoppel as a defense in their Joint Answer, as is required by Federal Rule of Civil Procedure 8(c)(1). While failure to timely raise an affirmative defense may result in waiver, *see* 2-8 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE - CIVIL § 8.08 (2010), waiver may be avoided if, as is the case here, at trial, the defense is tried by the express or implied consent of the parties pursuant to Federal Rule of Civil Procedure 15(b)(2), *id.* (citing collected cases). Because the State Court Action pleadings were entered into evidence and the underlying facts of the State Court Action were explored at length at trial either by or without objection from Plaintiff, the Court will consider and rule upon Debtors' collateral estoppel defense.

defalcation under § 523(a)(4), at least here in the Second Circuit, necessarily does.[3] The state court had no reason or opportunity to decide the issue of whether a defalcation occurred so as to bar discharge of Plaintiff's judgment debts in the event of future bankruptcy filings by Debtors. Moreover, "[i]t is well established that the bankruptcy court retains exclusive jurisdiction to determine the ultimate question of the dischargeability of the debt under federal bankruptcy law." *Shiboleth v. Yerushalmi (In re Yerushalmi)*, 393 B.R. 288, 294 (Bankr. E.D.N.Y. 2008) (citing *Archer v. Warner*, 538 U.S. 314, 321 (2003); *Grogan v. Garner*, 498 U.S. 279, 284–85 (1991); *Brown v. Felsen*, 442 U.S. 127, 129 (1979); *Bailey v. Sonnier (In re Sonnier)*, 157 B.R. 976, 979–80 (E.D. La. 1993)). Accordingly, this Court rejects Debtors' collateral estoppel defense.

With the exception of Plaintiff's cause of action "brought pursuant to Article 3-A of the Lien Law of the State of New York" (Compl. ¶ 34), Debtors' statute of limitations arguments are also unconvincing. Debtors are correct that Plaintiff would be time-barred under New York law from enforcing any trust arising under Article 3-A related to the Simmons Project because more than one year from the date of completion of the Simmons Project had passed. *See* N.Y. LIEN LAW § 77(2) (Consol. 2010) (one year statute of limitations begins to run from the date on which final payment under the contract becomes due or from the date of completion of the improvement). If Plaintiff were seeking judgment for the amount of the debt pursuant to Article 3-A, which is how Plaintiff's cause of action reads notwithstanding that Plaintiff already holds the judgments against both Debtors, then this Court's "adjudicat[ion] of the matter would constitute an impermissible circumvention of the state statute," *In re Reese*, Chapter 13 Case No.

---

[3] The Court discusses the controlling standard for defalcation within this Circuit in greater detail *infra*. See Discussion Part III. The distinctions between Article 3-A and § 523(a)(4) cannot be overemphasized by this Court, as Article 3-A violations frequently give rise to creditors' § 523(a)(4) causes of action.

97-61903, Adv. Pro. No. 01-80066, slip op. at 8 (Bankr. N.D.N.Y. Oct. 28, 2002). On this ground, dismissal of Plaintiff's cause of action under Article 3-A is warranted.[4]

The same reasoning does not apply, however, to Plaintiff's other causes of action, all of which seek nondischargeability on grounds of misappropriation or diversion of trust funds. Debtors assert, and the Court agrees, that Plaintiff is relying on Article 3-A violations to support its bankruptcy causes of action. Plaintiff in essence alleges that an Article 3-A trust fund diversion claim is nondischargeable under § 523(a)(4) as a matter of law. As such, Debtors argue that the statute of limitations applicable to Article 3-A should also apply here. (Defs.' Post-Trial Mem. of Law at 5–7.) This Court is not the first bankruptcy court to address this issue. The Honorable John C. Ninfo, II, United States Bankruptcy Judge for the Western District of New York, in a well-reasoned decision, determined,

> when the only claim or cause of action that a trust fund beneficiary claimant has against the debtor is for a diversion of trust funds, and the New York Statute of Limitations provided for by Section 77(2) of the Lien Law has expired prior to the filing of the debtor's petition, [the] Bankruptcy Court will not inquire into the other elements under the Lien Law and Section 523(a)(4) that might otherwise result in it determining that the debtor had diverted trust funds, *because there is no right to payment, enforceable claim or debt due from the debtor.*

*Kovalsky-Carr Electric Supply Co., Inc. v. Young (In re Young)*, 313 B.R. 555, 560 (Bankr. W.D.N.Y. 2004) (rejecting the idea that issues of an enforceable claim should be left to state courts after issues of diversion of trust funds, breach of fiduciary duty, and nondischargeability are determined in bankruptcy court) (emphasis added); *accord In re Yerushalmi*, 393 B.R. at 293. Judge Ninfo continued to state, however, that

> even if the one year statute of limitations under Section 77(2) of the Lien Law has expired prior to the filing of the debtor's bankruptcy petition, if the trust fund beneficiary plaintiff in the Section 523(a)(4) Adversary Proceeding has an

---

[4] The Court need not decide whether Plaintiff would be time-barred under Article 3-A from enforcing a separate trust arising in relation to the Spec Homes Project. As discussed *infra*, *see* Discussion Part II, a trust did not arise in the first instance with respect to the same.

> enforceable obligation, and thus a right to payment, enforceable claim and debt due from the debtor, *under any legal theory when the bankruptcy case is commenced* (such as having an enforceable state court judgment, valid contractual obligation or written guaranty), that trust fund beneficiary plaintiff will have an opportunity . . . to prove that the debt is nondischargeable under . . . Section 523.

*In re Young*, 313 B.R. at 560 (emphasis added). Where, as here, a debt is reduced to judgment, a statute of limitations argument against the judgment is without merit. *In re Yerushalmi*, 393 B.R. at 293 (citing *In re Friedenberg*, 12 B.R. 901, 905 (Bankr. S.D.N.Y. 1981)). This does not, however, mean that the applicable state law statute of limitations is wholly irrelevant to a § 523(a)(4) claim, as the Court will soon address. *See In G.W. White & Son v. Tripp (In re Tripp)*, 189 B.R. 29, 35 (Bankr. N.D.N.Y. 1995) ("Whether or not the Article 3-A statute of limitations has run is an issue of material fact with respect to a cause of action based on Code § 523(a)(4) *only* if it defines the existence of the Debtor's role as a fiduciary.") (emphasis in original).

Debtors' final affirmative defense of waiver rests on Debtors' contention that Plaintiff waived its claims against Debtors when it endorsed the final payment from the Simmonses back to Moses, accepted post-judgment payment from Butchson, and/or released the liens held against the Simmonses property and/or the spec homes. The Court must also reject this defense because once a debt is reduced to judgment, the defense of waiver is inapplicable to a § 523 nondischargeability proceeding. The existence of a debt or enforceable obligation is a "threshold condition" to whether § 523 applies. *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998). Waiver would have been an available defense in the State Court Action, so as to disprove the very existence of a debt for inclusion in any future bankruptcy filing by either Butchson or John. *See Gronewoller v. DM Capital, Inc. (In re Mascio)*, 2007 U.S. Dist. LEXIS 86690, at *15 (D.C. Colo. Nov. 13, 2007). Given the existence of judgments against each Debtor, however, the

defense of waiver does not prevent Plaintiff from now trying to establish nondischargeability of its claims under § 523.

## II.  White's Lumber's Right to Proceed Against Debtors as Fiduciaries

Section 523(a)(4) on its very face requires that the challenged debt arise from the debtor's acts "while acting in a fiduciary capacity."  11 U.S.C. § 523(a)(4) (2006).  At the close of trial, the Court asked the parties to brief the issue of whether a fiduciary relationship existed between Plaintiff and Debtors individually.  As noted, Debtors squarely addressed this issue in their Post-Trial Memorandum, arguing that neither Debtor was acting as a fiduciary with respect to the Spec Homes Project and that Butchson was not acting as a fiduciary with respect to the Simmons Project.  (Debtors' Mem. of Law at 11–13.)  For the foregoing reasons, the Court agrees with Debtors that there is no statutory basis under Article 3-A from which to declare that a fiduciary relationship existed between Butchson and Plaintiff.

"Courts have narrowly construed the term fiduciary for purposes of § 523(a)(4), holding that the fiduciary relationship must arise from a preexisting or technical trust." *Schiedelman v. Henderson (In re Henderson)*, 423 B.R. 598, 623 (Bankr. N.D.N.Y. 2010) (citing cases).  While federal bankruptcy law controls who is a fiduciary for purposes of § 523(a)(4), state law is relevant to determine whether a trust relationship exists.  15 A.L.R. FED. 2d 337 (2010).  In this case, the Court looks to Article 3-A, which bankruptcy courts have routinely held "does create the type of fiduciary duty that is within the contemplation of 11 U.S.C. § 523(a)(4)."  *Irr Supply Ctrs. v. Phipps (In re Phipps)*, 217 B.R. 427, 432 (Bankr. W.D.N.Y. 1998); *accord, e.g., In re Tripp*, 189 B.R. at 35 (citing *In re Grosso*, 9 B.R. 815, (Bankr. N.D.N.Y. 1981)).

Neither Debtor was a statutory trustee under Article 3-A with respect to the Spec Homes Project for the reason that no trust was ever created in connection with the same.  An owner of

real property is deemed to be a statutory trustee only in the event that he or she receives funds, such as in connection with a contract, mortgage, conveyance, or assignment. *See* N.Y. LIEN LAW § 70(5) (Consol. 2010). John is the record owner of the property where the spec homes are located, but he did not receive funds in connection with the Spec Homes Project. He is therefore not a fiduciary with respect to the Spec Homes Project. Further, Butchson simply invested his own funds in the Spec Homes Project, without the influx of funds from a third-party lender, insurance company, or good-faith purchaser. Thus, nonpayment for materials and supplies used in connection with the Spec Homes Project would not give rise to a § 523(a)(4) claim.

But there is no question that John was acting as a fiduciary until every trust claim had been paid or discharged or until such assets had been applied for the purposes of the trust with respect to the Simmons Project because he was the contractor and direct recipient of monies paid by the Simmonses to him in connection with the parties' home construction contract. *See id.* § 70(2), (3) (funds received by a contractor in connection with an improvement of real property constitute trust assets over which the contractor is the trustee, and the trust shall terminate upon payment or discharge of all trust claims). Butchson, on the other hand, neither contracted with the Simmonses nor received payment from the Simmonses. Thus, he was not a statutory trustee over the trust created by the Simmons Project.

Accordingly, all causes of action against Debtor Butchson Barksdale must be dismissed. In light of the same, the Court is left to decide Plaintiff's § 523(a)(4) claim against John for his alleged wrongful conduct in relation to the Simmons Project.

### III. Nondischargeability Under 11 U.S.C. § 523(a)(4)

"The principal advantage bankruptcy offers an individual lies in the benefits associated with discharge." Thomas H. Jackson, *The Fresh-Start Policy in Bankruptcy*, 98 HARV. L. REV.

1393, 1393 (1985). Discharge releases the honest debtor from oppressive indebtedness, thereby providing the debtor with a financial fresh start. Brian S. Sommer, *Interpreting 11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code: Substantive Law Approach Versus Policy-Based Arguments [Archer v. Warner, 538 U.S. 314 (2003)]*, 43 WASHBURN L.J. 489, 489 (citing Jackson, 98 HARV. L. REV. at 1393.) In the interest of protecting creditors and discouraging unscrupulous debtors, *see id.*, § 523 excepts certain categories of debts from discharge. "The exceptions to discharge provided there are intended to handicap the dishonest debtor's emergence from bankruptcy: they apply to debts deemed so important by Congress that not even the purgation of the bankruptcy process can wash them away." Matthew W. Knox, Note, *Persistent Confusion: The Circuit Split Over the Exception to Discharge for Defalcation Under 11 U.S.C. § 523(a)(4)*, 2008 COLUM. BUS. L. REV. 1078, 1106 (2008). "The consequences to a debtor whose obligations are not discharged are considerable; in many instances, failure to achieve discharge can amount to a financial death sentence." *In re Hyman*, 502 F.3d 61, 66 (2d Cir. 2007). "In view of these harsh consequences, exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *Id.* (citing *In re Renshaw*, 222 F.3d 82, 86 (2d Cir. 2000); *In re Hayes*, 183 F.3d 162, 167 (2d Cir. 1999)). It is incumbent upon the moving creditor in a nondischargeability proceeding to prove by a preponderance of the evidence that his debt is exempt from discharge under § 523. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

In John's case, Plaintiff seeks to except from discharge the John Judgment pursuant to § 523(a)(4). Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4) (2006).

Because Plaintiff's cause of action is plead as one for defalcation only, the Court's inquiry and determination are narrow in scope.

Preliminarily, the Court notes that Plaintiff did not affirmatively prove through its own records or otherwise that it properly applied payments received by Debtors to the trust created in relation to the Simmons Project. Failure to do so would ordinarily prohibit the Court from determining with certainty whether the John Judgment resulted from John's fiduciary status. *See In re Tripp*, 189 B.R. at 35 (the court must find that a trust existed and determine whether debtor's role as a fiduciary under Article 3-A coincided with the challenged debt). Here, due to the parties' stipulation to the fact that "[Plaintiff] was not paid for the building supplies and materials supplied to the *[Simmonses] home*," (Joint Stip. ¶ 9) (emphasis added), the Court must find that John was acting in a fiduciary capacity. The only question for adjudication then is whether Plaintiff has provided sufficient evidence to satisfy the mens rea element of § 523(a)(4).

The various Circuits are divided over the standard that should be applied to this element of the exception to discharge for defalcation under § 523(a)(4). *In re Hyman*, 502 F.3d at 66 (noting that there has been much debate among Circuits over whether defalcation includes all misappropriations or failures to account or only those that evince some wrongful conduct); *accord* Knox, 2008 COLUM. BUS. L. REV. 1078 (arguing in favor of a mens rea standard modeled on the business judgment rule common to corporate law). The three competing standards that have emerged are as follows: (1) the Fourth, Eighth, and Ninth Circuits adopted an innocent mistake standard, such that negligence or even an innocent misappropriation or failure to account is sufficient, (2) the Fifth, Sixth, and Seventh Circuits adopted a willful neglect/recklessness standard, thus requiring some level of mental culpability, and (3) the First Circuit adopted an extreme recklessness standard, the strictest of all, which requires conscious misbehavior or

extreme recklessness.  *See* Knox, 2008 COLUM. BUS. L. REV. at 1088–1104 (examining case law and explaining the rules for each respective standard).[5]  After examining each of these approaches, the Second Circuit aligned itself with the First Circuit on the issue of what degree of fault or state of mind must be shown by a creditor to prevail on a § 523(a)(4) cause of action.  The Second Circuit explained:

> [W]e now align ourselves with the First Circuit, in holding that defalcation under § 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness-a showing akin to the showing required for scienter in the securities law context. . . .
> . . . .
> This standard ensures that the term 'defalcation' complements but does not dilute the other terms of the provision–'fraud,' 'embezzlement,' and 'larceny'–all of which require a showing of actual wrongful intent. . . .
> By requiring courts to make appropriate findings of conscious misbehavior or recklessness in the course of dischargeability litigation, the standard we adopt today insures that the harsh sanction of non-dischargeability is reserved for those who exhibit some portion of misconduct.  The standard does not reach fiduciaries who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct now shown to be sufficiently culpable.

*In re Hyman*, 502 F.3d at 68–69.

The parties' arguments ignore the narrowly drawn requirements for nondischargeability on account of defalcation under § 523(a)(4) as espoused by the Second Circuit in *Hyman*.  For example, Plaintiff argues that John's failure to maintain detailed books and records documenting the receipts and expenses of the trust assets comprised of funds received by him for the construction of the Simmons Project, as well as his admissions that (1) he did not segregate deposits from the Simmons Project and (2) monies in his business account were then used to pay personal expenses, collectively give rise to a presumption of diversion under state law.  Relying on pre-*Hyman* case law defining defalcation as *any* failure by a fiduciary to account for or pay

---

[5] Unfortunately, this debate will not be settled in the near future given the Supreme Court's recent denial of certiorari on the issue.

Case 09-80027-6-dd    Doc 28    Filed 09/29/10    Entered 09/29/10 16:40:34    Desc Main
                      Document      Page 19 of 20
                                                                                              19

over trust fund monies, Plaintiff then summarily concludes that John's failure to account for trust assets and the diversion of trust assets rises to the level of defalcation for purposes of nondischargeability. (*See* Pl.'s Post-Trial Mem. at 1, 3–5.) The Court does not agree in light of *Hyman*. Rather, the Court must conclude from the record before it that Plaintiff did not make the requisite showing of "conscious misbehavior or extreme recklessness" by John.

John's involvement in the day-to-day operation of the family's construction business ended in 2006, and Plaintiff did not require Butchson to open a separate credit account or prohibit him from purchasing materials and supplies under John's account. At best, John's actions were those of neglect or entrustment of the family business and credit account to Butchson. While John's decision to maintain the open credit account and allow Butchson to use it may not have been prudent, it was neither challenged nor questioned by Plaintiff until nonpayment occurred.

Notwithstanding that only John's conduct is material to whether Plaintiff's debt against him survives his discharge, the record reflects a good faith effort by the Barksdale family to collectively preserve their construction business and to pay in full the amount owed to Plaintiff from various construction jobs, including the Simmons Project and the Spec Houses Project. Debtors presented Plaintiff with the final payment from the Simmonses and Plaintiff in turn agreed to allow Debtors to reinvest those funds into the Spec Homes Project rather than to immediately apply them to Debtors' outstanding account balance. In addition, Butchson and Moses invested their own funds into the Spec Homes Project in hopes of completing a finished home for sale in the future. Moses, with Plaintiff's full knowledge and cooperation, applied for a loan with Countrywide, but the loan never closed. Finally, Butchson signed a confession of

judgment and paid a large lump sum payment to Plaintiff subsequent to entry of the Butchson Judgment.

Under these facts and circumstances, Plaintiff's adversary complaint against John must also be dismissed in its entirety.

### IV. Debtors' Counterclaim for Attorneys' Fees

The only remaining matter for the Court to address is Debtors' counterclaim for attorneys' fees. Section 523(d) allows the Court to award costs and attorneys' fees only if (1) the creditor sought determination of dischargeability of a consumer debt under § 523(a)(2), (2) the debt is a consumer debt, and (3) the debt was discharged. 11 U.S.C. § 523(d) (2006). Given that Plaintiff did not bring a cause of action under § 523(a)(2), and Debtors have introduced no other basis upon which to premise a fee award, Debtors' counterclaim must be dismissed.

### CONCLUSION

For the foregoing reasons, it is hereby

ORDERED, that Plaintiff's Complaints against Debtors seeking a determination of nondischargeability under § 523(a)(4) are dismissed in their entirety; and it is further

ORDERED, that Debtors' counterclaim seeking costs and attorneys' fees is dismissed.

IT IS SO ORDERED.

Dated at Utica, New York
this 29th day of September 2010

/s/DIANE DAVIS_____
DIANE DAVIS
United States Bankruptcy Judge